## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **SHERRY LORRAINE SUMMERS ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 15-CV-677-GKF–PJC** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Plaintiff, Sherry Lorraine Summers, seeks judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner" and "SSA") denying Field's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* The matter has been referred to the undersigned Magistrate Judge for report and recommendation. For the reasons discussed below, the undersigned recommends that the Commissioner's decision be AFFIRMED.

### I. Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a

disability claim.  20 C.F.R. §§ 404.1520; *see, e.g., Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir.

2009) (detailing steps).[1]  "If a determination can be made at any of the steps that a claimant is or

is not disabled, evaluation under a subsequent step is not necessary." *Lax v. Astrue,* 489 F.3d

1080, 1084 (10th Cir. 2007) (citation and quotation omitted).

    Judicial review of the Commissioner's determination is limited in scope to two inquiries:

first, whether the decision of the Administrative Law Judge (ALJ) was supported by substantial

evidence in the record; and, second, whether the correct legal standards were applied. *Hamlin v.*

*Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted).  "Substantial evidence is such

evidence as a reasonable mind might accept as adequate to support a conclusion.  It requires

more than a scintilla, but less than preponderance." *Wall*, 561 F.3d at 1052 (quotation and

citation omitted).  Although the Court will not reweigh the evidence, the Court will

"meticulously examine the record as a whole, including anything that may undercut or detract

from the ALJ's findings in order to determine if the substantiality test has been met." *Id.*

(quotation and citation omitted).

## II.  Background

**A.    Plaintiff's Application**

     Summers protectively filed her application for disability insurance benefits on November

8, 2012.  (R. 161-62; 220.)  She claimed that she became disabled on February 9, 2012 (*see* R.

161, 179, 183, 220, 254) due to "neck, shoulder, hand, [clavicle], headaches and back." (R. 183).

---

[1]  Essentially, the steps involve answering the following questions:  (1) Is the claimant presently working? (2) Does the claimant have a severe impairment, *i.e*., one that "significantly limits" his or her ability to do basic work activities? (3) Does the impairment meet or equal an impairment listed in Appendix 1? (4) Does the impairment prevent the claimant from performing his or her past relevant work? (5) Does the impairment prevent the claimant from performing other jobs that exist in significant numbers in the national economy? *See Cleveland v. Policy Mgmt. Sys. Corp*., 526 U.S. 795, 804; 119 S.Ct. 1597, 1602, 143 L.Ed.2d 966 (1999).

On appeal and reconsideration, she explained that she had pain from on-the-job injuries she sustained, and she had an ascending aortic aneurysm.  (R. 142, 222.)  Indeed, she claims that the pain can cause her blood pressure to increase and the aneurysm to grow.  (R. 142, 222, 248.)

Summers previously worked as a janitor, cafeteria kitchen helper, cafeteria food service worker, or daycare worker.  (*See* R. 27, 192, and 211.)  She applied for and received Workers' Compensation benefits. (R. 163-71.)  Her injuries were to her cervical spine and right hip, right shoulder, right hand, throat (dysphasia), and left hip. (R. 164-71.)  Summers' application was denied initially and on reconsideration.

## B.    The Administrative Hearing

An administrative hearing was held before an ALJ on June 10, 2014.  (R. 61-107.)  At the hearing, Summers amended the alleged onset date of disability to November 8, 2012, apparently because, as her attorney stated, "that is after all work activity had stopped."   (R. 66; *see* R. 192, 270.)  Her attorney stated that Summers had a "history of degenerative disc disease and a C-spine with a history of three surgeries and a lumbar spine with a history of two surgeries; a history with carpal tunnel syndrome on the right; a right shoulder injury requiring surgical repair of the rotator cuff; a heart aneurysm which has caused chest pains; a surgery on her right clavicle and depression, amongst some other issues." (R. 67.)  Summers testified, among other things, as to her education and previous work experience, the conditions that she felt prevented her from returning to work, her symptoms, medications, surgeries, injuries, abilities, restrictions, pain, activities of daily living, relationships, and sources of income. (R. 67 – 92.)  The ALJ also questioned a vocational expert (VE) as to Plaintiff's work experience and the types of occupations that could be performed by someone with her abilities and functional limitations as set forth in hypothetical questions by the ALJ.  (R. 92 – 105.)

C.      **The ALJ's Decision**

By decision dated August 13, 2014, the ALJ found that Summers had not been disabled, as defined in the Social Security Act, from November 8, 2012, through the date of the decision. (R. 13-29.)  In relevant part, the ALJ described Summers' severe impairments as "neck; back; shoulder; hand; headaches; heart; depression; anxiety."  (R. 15.)  He opined that none of these impairments or combination of impairments met or medically equaled the severity of one of the listed impairments. (*Id*.)  The ALJ determined that Plaintiff had the residual functional capacity to perform light work, but with numerous limitations.  (R. 18-19.)  Specifically, he stated:

> The claimant is able to lift and carry to twenty pounds, stand and walk for six hours in an eight-hour day, and sit for six hours in an eight-hour day, with normal breaks.  The claimant is occasionally able to climb, bend, stoop, squat, kneel, crouch, crawl, push/pull with the right upper extremity and twist and nod the head.  She has slight limitation in the ability to finger, feel and grip with the right upper extremity, and slight limitation in the ability to reach with the right upper extremity.  A slight limitation is use between frequent and constant.  The claimant needs a low noise, low light work environment and she should avoid cold and wet work environments.  The claimant is limited to simple, repetitive, routine work.  This limits both stress and content of work.  She has a slight limitation in contact with the public, co-workers, and supervisors.  Contact with the public should be brief and cursory, but it may be repetitive, and she is able to work on an assembly line and attend shift meetings, but should not be an integral member of a team that will participate in goal setting or process planning.  There is no restriction on routine, ordinary supervision.  The claimant is afflicted with symptomatology form a variety of sources that produce mild to moderate chronic pain, which is of sufficient severity to be noticeable to her at all times, but she is able to remain attentive and responsive in a work setting and carry out normal work assignments satisfactorily.  She takes medications for the relief of her symptomatology, but the medications do not preclude her from functioning at the sedentary and light level as restricted, and she would remain reasonably alert to perform required functions presented by her work setting.  While functioning at the sedentary and light level, as restricted, the claimant would find it necessary to alter position from time to time to relieve her symptomatology, but this would not require her to leave the workstation, and would not have an impact on her ability to meet production quotas.

(R. 19.)

In the opinion, the ALJ also provided a brief timeline of the injuries and surgeries relevant to his RFC. (*See* R. 20-21.)  Summers was injured at work on September 29, 2006,

followed by surgery on July 26, 2007 and a carpal tunnel release in 2008.  She had surgery to her right shoulder on April 27, 2009, and then she had a cervical fusion on February 2, 2010. Another work injury occurred on July 13, 2011, and she had another surgery to her cervical spine on September 15, 2011.  Subsequent to that surgery, she had removal of the cervical instrumentation.  *Id.*  The ALJ also detailed the issues Plaintiff has had with her heart, and the depression and anxiety she has experienced.  (*See* R. 16-18; 21-23.)

In the ALJ's opinion, Summers was unable to perform any past relevant work as a janitor, cafeteria kitchen helper, cafeteria food service worker, or daycare worker.  (R. 27.) Nonetheless, considering Summers' age, education, work experience, and residual functional capacity, there were jobs that exist in significant numbers in the national economy that she could perform. (R. 27.)   The vocational expert who testified at the hearing stated that, given the hypothetical questions posed by the ALJ, someone like Summers could perform the requirements of representative occupations such as cashier and hotel housekeeper.  (R. 28.)

Summers requested review of the decision, and, on September 25, 2014, the Appeals Council denied review.  (R. 1-7.)  Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal.  20 C.F.R. § 404.981.   Summers timely sought review by this Court.

### III.  Review

On appeal, argues specifically that (1) the ALJ failed to sustain his burden of proof at step five of the sequential evaluation process; (2) the ALJ improperly evaluated and weighed the medical source evidence; and (3) the ALJ failed to perform a proper credibility analysis.

A.      **Step Five**

Plaintiff's argument with regard to the ALJ's Step Five analysis is two-part.  First, she

argues that, if the ALJ's finding limits her to repetitive, routine work, she cannot perform the job

of cashier, DOT #211.462.010, which has a reasoning level of 3.  Second, she argues that the

duties of hotel housekeeper, DOT #323.687l014 cannot be performed by a person who is able to

push/pull with her right, dominant, arm only "occasionally." (*See* R. 19.)

Residual Functional Capacity (RFC) is the most a claimant can still do despite physical

and mental limitations. *See* 20 C.F.R. § 404.1545.  At step five of the process for evaluating

disability claims, the burden shifts to the Commissioner to show that there are jobs in significant

numbers that the claimant can perform taking into account his age, education, work experience

and RFC.  *Haddock v. Apfel*, 196 F.3d 1084, 1088-89 (10th Cir. 1999).  The ALJ is allowed to do

this through the testimony of a vocational expert.  *Id.* at 1089.  "The agency uses the Dictionary

[of Occupational Titles (the "DOT")[2]], among other publications . . . , as source material when it

formulates the grids[3] for use at step five."  *See* Social Security Ruling 83–10 (S.S.A.), 1983 WL

31251, at *3 (citing 20 C.F.R. § 404.1566(d)); *see also* 20 C.F.R. pt. 404, subpt. P, app. 2, §

200.00(b)."  *Id.* at 1089-90.

(1)     **Reasoning Level**

The level of reasoning to which Plaintiff refers is derived from the "Scale of General

Educational Development (GED)" in the *Dictionary of Occupational Titles*, App. C, 1991 WL

---

[2] U.S. Dep't of Labor, Employment & Training Admin., *Dictionary of Occupational Titles* (4th rev. ed.1991).

[3] The "grids" are based on the four relevant factors contained in the Social Security Act: physical ability, age, education, and work experience.  They provide a "shortcut" of rules that determine whether jobs exist in significant numbers that a claimant with certain characteristics can perform. *See Daniels v. Apfel*, 154 F.3d 1129, 1132 (10th Cir. 1998); *Evans v. Chater*, 55 F.3d 530, 532 (10th Cir. 1995).

688702.  "General Educational Development embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance. . . . The GED Scale is composed of three divisions:  Reasoning Development, Mathematical Development, and Language Development."  *Id*.  A person with level three reasoning development is able to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form [and d]eal with problems involving several concrete variables in or from standardized situations."  *Id*, § III.

At the hearing of this matter, the VE identified two jobs that the Summers could do, assuming the hypothetical question posed by the ALJ based on a person with Summers' vocational profile and the ALJ's assessment of Summers' RFC.  (*See* R. 93-102. ) Those two jobs were cashier, DOT Code 211.462-010, and hotel housekeeper, DOT Code 323.687-014. The cashier job description shows a reasoning level of three and the housekeeping job shows a reasoning level of one.  Several courts have found that reasoning level three jobs may exceed simple, routine, and repetitive work.  *See* Pl. Br., Dkt. # 12, at 2 (citing *Pritchett v. Astrue*, 220 F. App'x 790, 793 (10th Cir. 2007) (unpublished); *Garcia v. Barnhart*, 188 F. App'x 760, 766 (10th Cir. 2006) (unpublished); and *Hackett v. Barnhart*, 395 F.3d 1168, 1171 (10th Cir. 2005), among others), and they have remanded to allow the ALJ to address the apparent conflict.

The Tenth Circuit follows the rule requiring an ALJ to elicit a reasonable explanation from the VE for any apparent conflicts.  *See Poppa v. Astrue*, 569 F.3d 1167, 1173 (10th Cir. 2009) (quoting SSR 00–4p, 2000 WL 1898704, at *4); *see also Hackett,* 395 F.3d at 1176; *Haddock,* 196 F.3d at 1087.  In *Hackett*, the seminal case on this issue, the Tenth Circuit Court of Appeals remanded the case "to allow the ALJ to address the apparent conflict between the [p]laintiff's inability to perform more than simple and repetitive tasks and the level-three reasoning required

by the jobs identified as appropriate for her by the VE." 395 F.3d at 1176.  The ALJ in this matter

asked the VE whether there had been any deviation from the Dictionary of Occupational Titles

that the VE felt needed to be explained or required further explanation, and the VE did not indicate

that there was any deviation with regard to reasoning levels.  (R. 101.)  Although the ALJ did not

ask specifically about the apparent conflict between reasoning level three and jobs limited to

simple, routine, and repetitive work, it is not clear from the case law that the ALJ must be that

specific.  *See Thompson v. Colvin*, 551 F. App'x 944, 949 (10th Cir. 2014) (unpublished) (rejecting

the claimant's argument that the VE's testimony conflicted with the DOT where "the VE testified

that the jobs he identified were consistent with a hypothetical person with [the claimant's]

impairments and the DOT.")[4]

Nonetheless, any error by the ALJ with regard to the reasoning level and the limitation at

issue here is harmless, and remand is not necessary, because the VE identified another job – hotel

housekeeper – which had a GED reasoning level of one.  *See* DOT, 323.687-014, 1991 WL

672783.  The VE testified that there are 8,700 jobs for hotel housekeepers in Oklahoma, and

870,000 in the nation.  (R. 100-101.)  The Commissioner is entitled to deny benefits to a social

security claimant if he finds that the claimant can "engage in . . . substantial gainful work which

exists in the national economy." 42 U.S.C. §423(d)(2)(A).  For purposes of the statute, "'work

which exists in the national economy' means work which exists in significant numbers either in

the region where [the claimant] lives or in several regions of the country." *Id.* Plaintiff can engage

in substantial gainful work if she is limited to simple, repetitive and routine work.

---

[4] Further, Defendant has drawn the Court's attention to the Report and Recommendation in
*Lowery v. Colvin*, No. 14-CV-310-JHP-FHM (N.D. Okla. January 7, 2016), where the court
explained that "the *Hackett* Court did not hold that the level-three reasoning was necessarily
inconsistent with simple and routine work, only that it appeared to be" and that "*Hackett* cannot
be read as establishing a bright line rule that a job with level-three reasoning cannot, without
further explanation, qualify as a job requiring performance of simple routine tasks." *Id.* at 4.

(2)     **Ability to Push/Pull**

Plaintiff argues that the housekeeping job is foreclosed because the ALJ stated that Plaintiff is only "occasionally able to . . . push/pull with the right upper extremity."  (R. 19.) Further, the DOT indicates that "handling" of things is a significant part of the job, and it may include making beds, moving furniture, hanging drapes, and rolling carpets, among numerous other duties.  *See* DOT #323.687-014, 1991 WL 672783.  The undersigned agrees that it is unreasonable to expect someone who can lift no more than 20 pounds, who only "occasionally" push or pull with the right upper extremity, and who has "slight" manipulative limitations, to make beds, move furniture, hang drapes, roll carpets, or perform most of the other duties of a competent hotel housekeeper on a daily basis.  However, the Court need not decide whether the ALJ's error with regard to the housekeeping job warrants remand, since the ALJ properly found that Plaintiff can perform the job of cashier, of which there are 40,000 jobs in Oklahoma and 330,000 in the national economy.  Accordingly, the undersigned finds that the ALJ did not fail to sustain his burden of proof at step five of the sequential evaluation process.

**B.     Medical Source Evidence**

Summers argues that the ALJ improperly evaluated and weighed the medical source evidence.  In particular, she takes issue with the weight given by the ALJ to the opinions of John S. Marouk, D.O., Kenneth R. Trinidad, D.O., Seth Nodine, M.D., Scott Anthony, D.O., Mike Gietzen, M.D., Sara Land, D.O., and the Oklahoma Heart Institute.

Generally, the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a non-examining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).  A treating physician opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory

diagnostic techniques," and it is not inconsistent with other substantial evidence in the record. *E.g., Mays v. Colvin*, 739 F.3d 569, 574 (10th Cir. 2014) (quoting *Robinson*, 366 F.3d at 1082); *see also* 20 C.F.R. 404.1527(c)(2). "When assessing a medical opinion, the ALJ must consider the factors listed in 20 C.F.R. § 404.1527(c)(2) and give good reasons for the weight he assigns to the opinion." *Vigil v. Colvin*, 805 F.3d 1199, 1202 (10th Cir. 2015) (citations omitted).  However, an ALJ is not required to explicitly discuss all of the factors in deciding what weight to give a medical opinion.  *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007).  When an RFC conflicts with an opinion from a medical source, the ALJ must explain why the opinion was not adopted.  SSR 96-8P (S.S.A.), 1996 WL 374184 at *7.  However, ultimately the ALJ—not a physician—is charged with determining the claimant's RFC.  20 C.F.R. §§ 404.1527(d); *see Howard v. Barnhart*, 379 F.3d 945, 949 (10th Cir. 2004).

### (1)  Dr. Marouk

 John Marouk was one of Summers' treating physicians.  He is a neurosurgeon who performed a second surgery to repair Summers' broken cervical fusion after her 2011 work injury. (*See generally* R. 314-66.)  On March 20, 2012, Dr. Marouk stated that he thought Summers had achieved maximum medical improvement with respect to her cervical spine, and he released her to resume work with a thirty-five pound weight restriction.  (R. 316-17.)  The ALJ described the work and findings of Dr. Marouk in his decision before according controlling weight to Dr. Marouk's opinion, noting that it was well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the opinions of the State agency medical consultants Roberta Herman, M.D. and Charles Clayton, M.D.  (R. 21, 24; *see* R. 109-19, 121-36.)

As the ALJ acknowledged, Dr. Marouk's opinion was inconsistent with the third and final opinion of Kenneth R. Trinidad, D.O., who was not a treating physician but a consultant who evaluated Plaintiff for purposes of her Workers' Compensation claim.  (*See* R. 472-502.)  Dr. Trinidad first evaluated Summers on August 23, 2011, and found that she had not achieved maximum medical recovery and required further treatment.  (R. 497- 501.)  However, he evaluated her again on June 25, 2012, and found that she had achieved maximum medical recovery and her condition was stable.  (R. 487-96.)  Specifically, he found that she had a sixty-seven percent impairment to the whole person as a result of injury to her cervical spine.  (R. 493-94.)  He did not opine that she was unable to work.

Dr. Trinidad's third and final evaluation is dated March 19, 2013.  (R. 478-82.)  His physical examination findings are remarkably similar in several respects to his June 24, 2012 examination, including her exact weight, and the identical ranges of motion for her right shoulder and cervical spine.  His observations were also the same regarding tenderness, crepitance, and weakness, although he stated that her left wrist, and not the right wrist (where she had surgery), had scars of three centimeter.  (*Compare* R. 480 with R. 484.)  Nonetheless, he opined that she was "100 percent permanently and totally disabled on an economic and physical basis as she is unable to earn any wage in any employment for which she is, or could become, physically suited or reasonably fitted by education, training or experience." (R. 481.)

The ALJ appropriately noted that the question of whether the individual is disabled or unable to work is an opinion on an issue reserved to the Commissioner.  *See* 20 C.F.R. §404.1527(d); *e.g., Howard*, 379 F.3d at 949.  Decisions by other agencies on the issue are not binding upon the Social Security Administration.  20 C.F.R. §404.1504; *e.g. Freeman v. Astrue*, 441 F. App'x 571, 573-74 (10th Cir. 2011 (unpublished).  However, a decision by another agency

must be considered by an ALJ.  SSR 06-03p; *e.g., Hackett*, 395 F.3d at 1172.  The ALJ considered

Dr. Trinidad's opinion, but gave it little weight, noting that the weight of the treating source

medical and opinion evidence supported the RFC, and the opinions of the State agency medical

consultants, Drs. Herman and Clayton, were consistent with, and supported by, the medical

evidence he had already discussed earlier in the decision.  (*See* R. 25.)

Plaintiff urges the Court to disregard Dr. Marouk's notes, which cover more than nineteen

months between August 5, 2011 and March 20, 2012, because they predate Plaintiff's November

8, 2012 alleged onset date of disability.  This argument overlooks the fact that Plaintiff initially

stated that she became disabled on February 9, 2012, and consistently stated this date as the date

of onset until it was discovered at the August 13, 2014 hearing that she had worked until

November of 2012.  Further, Dr. Trinidad's second opinion on June 25, 2012 occurred during that

time, and it is not clear why Dr. Trinidad's opinion changed between June of 2012 and March of

2013, since his examinations were remarkably similar.  The ALJ adequately explained why he did

not adopt Dr. Trinidad's opinion, and he gave good reasons for the weight he assigned to the

opinions of both Dr. Trinidad and Dr. Marouk.  He did not commit legal error by according more

weight to the opinion of Dr. Marouk than to the opinion of Dr. Trinidad.

**(2)     Dr. Nodine**

Plaintiff also claims that the February 27, 2013 findings of consultative examiner Seth

Nodine, M.D. support Dr. Trinidad's opinion that Plaintiff cannot work.  However, Plaintiff

highlights only those findings showing that Plaintiff has deficits in her range of motion,

tenderness, weakness, fatigue, pain, decreased sensation and opioid dependency, while her

argument ignores the findings showing where Plaintiff has strength, a negative straight-leg raising

test, deep tendon reflexes within normal limits, the ability to walk on heels and toes, a normal gait,

and use of her hands and fingers, among others.  (*See* R. 455-61.)  The ALJ discussed these as

well and gave "great weight" to Dr. Nodine's findings.  (*See* R. 16.)  Although Dr. Nodine's

assessment includes remarks about the severity of her condition and deficits, he did not opine that

Plaintiff was unable to work.  The ALJ properly incorporated Dr. Nodine's findings into his RFC

finding by imposing numerous functional limitations on Plaintiff's neck, right shoulder, and right

arm.  (*See* R. 18-19.)  He explicitly concluded that Dr. Nodine's assessment did not indicate

further limitation.  (R. 24.)

> **(3)**    **Dr. Anthony**

Plaintiff accuses the ALJ of mischaracterizing the medical evidence from Dr. Scott

Anthony, but the Court finds that the ALJ's discussion is fair.  Dr. Anthony saw Summers at the

request of the Workers' Compensation Court "for the purpose of continued medical maintenance."

(R. 464.)  He noted the severity of her pain and decreased range of motion as well as her muscle

spasms, stiffness, and soreness, and he placed her on Percocet, Baclofen and Neurontin.  (R. 464-

65.)  When he saw her on August 16, 2013, he stated that her symptoms had improved somewhat,

and he adjusted her medications, noting that she had continued to walk and exercise on a regular

basis. (R. 563.)  When he saw her on January 14, 2014, she was "doing reasonably well," in spite

of her persistent and chronic pain. (R. 556.)   She was taking Neurontin and Percocet at that time.

(*Id.*)

Plaintiff chose to highlight the first of these three opinions by Dr. Anthony while ignoring

the latter two.  Significantly, Dr. Anthony did not opine that Plaintiff had functional limitations

which would preclude her from working.  An ALJ is not required to specify the weight he accords

every medical opinion.  *Cf. Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1164-66 ((10th Cir. 2012)

(finding no harmful error where the ALJ did not assign a specific weight to opinions that either

contained no assessment of the claimant's work-related limitations or the limitations were not inconsistent with the ALJ's RFC.)  The ALJ adequately summarized the progression in Dr. Anthony's treatment of Plaintiff, and incorporated it, along with other medical opinions, into his RFC findings.

      **(4)**      **Dr. Gietzen, Dr. Land, and the Oklahoma Heart Institute**

Plaintiff's complaints with regard to the ALJ's discussion of the findings by Dr. Gietzen, Dr. Land, and the Oklahoma Heart Institute are not easy to follow and, in any event, not well-grounded.  Dr. Gietzen was Summers' primary care physician, and Dr. Land was the psychiatrist who treated Summers after Dr. Gietzen diagnosed her with depression.  (*See* R. 520, 525; R. 625-32.)  Plaintiff argues, initially, that the ALJ ignored Dr. Gietzen, "who warns of the interplay between uncontrolled pain that elevates her blood pressure, which in turn aggravates the aortic aneurysm." (Op. Br., Dkt. # 14, at 7.)  In the reply brief, Summers argues that the ALJ "failed to acknowledge the interplay between high blood pressure and anxiety and depression and her aortic aneurysm"; that Dr. Gietzen "notes that pain exacerbates her blood pressure, hence making her aortic aneurysm grow if the condition is not controlled"; and that the ALJ avoided "considering Dr. Gietzen's advice to keep Plaintiff calm to keep from aggravating her aneurysm."  (Reply Br., Dkt. # 16, at 1-2.)  These statements impermissibly stretch the statements made by Dr. Gietzen and mischaracterize the record.

Medical records show that Dr. Gietzen saw Summers six times between February 23, 2011 and May 6, 2013.  (*See* R. 519-41.)   In February, 2011, he saw her for arm and neck pain, and prescribed medications. (R. 539-41.)  In July of 2011, he saw her to discuss her medication for her pain after she had back surgery.  (R. 535-38.)  He did not see her again until February of 2013, when she presented for chest pain after a hospital visit.  (R. 531-33.)  This was the first visit where

he noted that she had congenital anomalies of aortic arch and unspecified essential hypertension. He referred her to cardiology and discussed the risks of keeping an elevated blood pressure.  (R. 533.)   In March of 2013, Summers presented to Dr. Gietzen for a follow up on laboratory and diagnostic tests.  (R. 527.)  He noted that that she had hyperlipidemia, hypoglycemia, and biliary colic, and he discussed the need for her to exercise and eat healthy, referred her to another doctor, and adjusted her medications.  (R. 528-29.)  On February 22, 1013, Summers presented for another hospital follow-up after a cholecystectomy.  (R. 523.)  Dr. Gietzen noted "no unusual anxiety or evidence of depression" in his physical exam findings, but diagnosed her with biliary colic, urinary tract infection, and depressive disorder.  (R. 525.)  His plan for the depression was to give her contact information for Claremore Family and Child services.  (*Id.*)

In May of 2013, Summers visited Dr. Gietzen for hypertension.  His report shows, in the "history" section, that she reported having hypertension which was getting worse and exacerbated by anxiety.  Associated symptoms included chest pain and headache, and she reported that her blood pressure was elevated when she had pain.  She had seen cardiologists who found abnormalities, and she was being scheduled for aneurysm surgery.  (R. 519.).  In his "Review of Symptoms" section, Dr. Gietzen found that she was "positive" for anxiety and depression, and he noted that she was scheduled to see a therapist.  He also discussed medication and treatment options.  (R. 520.)  His assessment/plan included hypertension and "depressive disorder, not elsewhere classified."  (R. 521.)  He started her on Cymbalta.  (*Id.*)

Over one month later, the State of Oklahoma, Disability Determination Division, sent Dr. Gietzen a "Treating Physician Mental Functional Assessment Questionnaire."  (R. 543-44).  He indicated that he was treating Summers for a mental condition, but that she did not have a mental condition that imposed more than minimal limitations.  He did not state her psychiatric diagnosis,

the signs and symptoms that led to the diagnosis, or any current functional limitations related to her mental condition.  (R. 543.)

Plaintiff continued to visit Dr. Gietzen in 2013 and 2014.  In July of 2013, Summers visited Dr. Gietzen for evaluation of a rash and a tick bite.  (*See* R. 620 – 24.)  On December 12, 2013, she presented to his office with neck pain, dizziness and palpitations.  (R. 607.)  He noted that her blood pressure was running on the higher side, and ordered an echocardiogram.  (R. 610.)  A week later, on December 18, 2013, she presented after a hospital visit for angina and her aneurism.  He referred her to cardiologists in Tulsa.  (R. 599 – 602.)  In February, 2014, she presented to discuss the results of a CT scan.  Dr. Gietzen said the scan showed a stable aortic aneurism that was asymptomatic.  (R. 594.)  He also assessed her as having a urinary tract infection and allergic rhinitis at this visit.  (R. 596.)  There was no discussion in Dr. Gietzen's notes regarding her mental or psychiatric status during these visits from July of 2013 through February of 2014.

The ALJ engaged in a comprehensive analysis of the findings related to Plaintiff's heart condition, including the dilation of her ascending thoracic aorta.  (*See* R. 16.)  At Step Three, he described how it had grown between 2009 and 2013, but the evidence indicated that, in 2014, the aneurysm appeared to have decreased in size and there was no dissection seen.  (R. 16-17; *see* 406, 552, 569, 571.)  In connection with his RFC analysis, the ALJ noted Dr. Land's diagnosis that claimant had major depressive disorder and Dr. Land continued to treat her for depression. (R. 22.)  He also highlighted the clinical findings of Dr. Gietzen before discussing the cardiology treatment provided to Summers by physicians from the Oklahoma Heart Institute and other medical centers beginning in March of 2013.  In particular, he referred to her statements indicating that, "[w]hen she is in pain, her blood pressure goes up, but normally it is under good control without

medications."  (R. 22; *see* R. 574.)  He described the good results of a February 2014 stress echocardiogram, and he noted Dr. Gietzen's April 3, 2014 statement that the CT scan performed in March of 2014 showed the aortic aneurysm to be stable and asymptomatic.  (R. 22.)  The ALJ incorporated all of these observations in his RFC.  (*See* R. 22-23.)

Later in the ALJ's decision, he rejected the opinions of the State agency psychological consultants who determined that there was no discrete mental impairment.  Instead, he stated that the claimant did have depression and anxiety, and he pointed to Dr. Gietzen's diagnosis in support.  (*See* R. 26.)  However, he did not find that her anxiety exacerbated her hypertension and cause associated physical symptoms.  (R. 26.)  He noted that Dr. Land treated Summers for depression, and Dr. Land's treatment notes do not support Dr. Gietzen's statement as to her anxiety.  (R. 22.)

When Dr. Land began treating Summers in July of 2013, her notation for anxiety is "no" (R. 631.)  In August, Summers stated to Dr. Land that she was "feeling better" and "really improved."  (R. 630.)  In September, she reported that she ran out of medications and got much worse, but her mood at the examination was "not bad."  (R. 629.)  In November, she was "still struggling some with depression," but her medications were "helpful," and her mood was "ok." (R. 628.)  In February of 2014, Summers reported that she learned she had an ascending aortic aneurysm and had been off Cymbalta "[because] they are worried it may raise my BP.  I've been off the medicine and everything is magnified 100% and I could cry about everything."  (R. 627.) Dr. Land added Lexapro to her regimen.  (*Id*.)  In April, 2014, Plaintiff reported that she had been doing better with Lexapro and Ambien helped with her sleep.  "She stated:  "I can tell a difference, I'm about 50% better."  (R. 626.)   There is no discussion in Dr. Land's notes of the effects of Summers' anxiety.   More important, the ALJ considered the records of both Dr. Gietzen and Dr.

Land, and properly found that the anxiety and depression were cause for including certain limitations in Plaintiff's RFC, but they did not preclude her from working.[5]  (*See* R. 26.)

**B.      Credibility Analysis**

Finally, Summers argues that the ALJ failed to perform a proper credibility analysis.  The Tenth Circuit Court of Appeals has observed:  "[C]redibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence."  *Wilson v. Astrue*, 602 F.3d 1136, 1144 (10th Cir. 2010) (internal quotation marks omitted).  Those findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  *Id.* (internal quotation marks omitted).  Yet, as long as the ALJ "sets forth the specific evidence he relies on in evaluating the claimant's credibility," there is no need for a "formalistic factor-by-factor recitation of the evidence." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1167 (10th Cir. 2012) (internal quotation and citation omitted).  "[C]ommon sense, not technical perfection, is [the] guide" of a reviewing court. *Id.*  The Court finds that the ALJ's determination in this case was supported by substantial evidence.

In his assessment of Plaintiff's mental impairments at Step Three of his analysis, the ALJ set forth Plaintiff's oral and written testimony regarding her activities of daily living, her mild difficulties in social functioning, and her moderate difficulties in concentration, persistence or pace, primarily due to her pain   (*See* R. 17-18.)  He again summarized her hearing testimony when he explained the rationale for his RFC findings.  (R. 20.)  Then, he began his credibility

---

[5] In her reply brief, Plaintiff accuses the ALJ of essentially ignoring "95 pages in Exhibits 12F through 19F, covering more than a year" in making a "faulty medical source evaluation."  Reply Br., Dkt. # 16, at 2-3.  This is a disingenuous statement.  The ALJ's decision is replete with references to, and discussion of, the evidence in Exhibits 13F, 14F, 15F, 16F, 17F, 18F, and 19F (*See* R. 16 – 18; 21-23, 26), even though the ALJ is not required to explicitly discuss every piece of medical evidence in his written decision. *See Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

analysis with this statement:  "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."  (R. 20.)

Subsequently, the ALJ proceeded with an extensive review of the evidence, especially with regard to her injuries, surgeries, and her complaints of pain as a result.  He recounted the medical records of Drs. Marouk, Anthony, Nodine, Land, and Gietzen, as well as the hospital records regarding her heart issues. (*See* R. 20-22.)  He concluded this portion of his record review with this finding:  "The claimant's statements about her impairments and their impact on her ability to perform activities of daily living and basic functions are not entirely credible in light of discrepancies between the claimant's alleged symptoms, and objective documentation in the file." (R. 23.)

The decision continues with the ALJ's comparison of Summers' "generally credible allegations of pain," with the functional activities she reported having the ability to perform "despite her pain."  (R. 23.)  He discussed the side effects she experienced due to some of the medications she took, as well as the beneficial aspects of those medications.  He contrasted her reports of chest pain and associated symptoms with the medical record regarding the testing of her heart.  He pointed out the RFC findings of Dr. Marouk and the State agency doctors before he found that the exertional limits in Summers' RFC were not "limited to the degree she alleges in her testimony."  (*Id.*)  He discussed the treatment notes in connection with her workers' compensation claims, and found that she had a slight limitation in finger, feel and grip with the

right upper extremity, and a slight limitation in reaching with the right upper extremity.  (R. 23-24.)

As set forth above, the ALJ then explained why he accorded more weight to the opinion of her neurosurgeon, Dr. Marouk, than to the opinion of Dr. Trinidad, who evaluated her for purposes of her workers' compensation claim.  (R. 24.)  Further, he discussed the basis for the mental limitations he included in his RFC finding for her, as well as his reasons for discounting the statements of Plaintiff's mother.  (R. 25-27.  He concluded:

> The undersigned does not discount all of the claimant's complaints; however, the evidence demonstrates that even though the claimant does have medically determinable impairments, none are severe enough to prevent the claimant from participating in substantial gainful activity, given the residual functional capacity set forth above.  Given the objective medical evidence in the record, the undersigned finds that the claimant's residual functional capacity is reasonable.  The claimant could function within those limitations without experience significant exacerbation of symptoms.

(R. 27.)

Far from being "meaningless boilerplate," as Plaintiff alleges, this is the culmination of a lengthy recitation of Plaintiff's testimony and medical record.  The ALJ explained throughout his decision why he found her complaints "not entirely credible." (R. 20).  He did not ignore her complaints of pain, her attempts to find relief, her contacts with doctors, her psychological problems, her daily activities, her medications, or any other relevant factor.   The ALJ's credibility findings were closely and affirmatively linked to substantial evidence, and he set forth the specific evidence he relied upon in evaluating Summers' credibility.  Despite Plaintiff's argument to the contrary, the ALJ did not fail to perform a proper credibility analysis.

## IV.  Conclusion

The undersigned finds that the ALJ's decision is supported by substantial evidence in the record, and the correct legal standards were applied.  Accordingly, the undersigned United States

Magistrate Judge recommends that the decision of the Commissioner finding Plaintiff not disabled be AFFIRMED.

## V.  Objections

In accordance with 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b)(2), a party may file specific written objections to this report and recommendation, but must do so within fourteen (14) days after being served with a copy.  If specific written objections are timely filed, the District Judge assigned to this case will make a *de novo* determination in accordance with Rule 72(b).  A party waives District Court review and appellate review by failing to file objections that are timely and sufficiently specific (the "firm waiver rule").  *Moore v. Astrue*, 491 F. App'x 921, 923 (10th Cir. 2012) (unpublished) (citing *United States v. One Parcel of Real Property*, 73 F.3d 1057, 1060 (10th Cir. 1996)).

**ENTERED** this 22nd day of December, 2016.

Paul J. Cleary
United States Magistrate Judge